## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MIHCIGAN

RAY AHMED FAYAD,

        Plaintiff,

v.

CITY OF HIGHLAND PARK, a municipal corp.;
JAMES MCMAHON, City of Highland Park
Officer; KELLY DUPUIS, City of Highland Park
Officer; CHESTER LOGAN, City of Highland
Park Chief of Police; CITY OF HAMTRAMCK,
a municipal corporation; MICHAEL STOUT,
City of Hamtramck Officer; ANDREW
ROBINSON, City of Hamtramck Officer; ANNE
MOISE, City of Hamtramck Chief of Police;
YOUSEF DABAJA, all in their individual and
official capacities; and BOULEVARD &
TRUMBELL TOWING, INC., a Delaware
corporation, all jointly and severally,

        Defendants.

Case No.:  18-cv-13982

Hon. Terrence G. Berg

| | |
|---|---|
| **Goodman Hurwitz & James P.C.** | **Ernst Charara & Lovell, PLC** |
| Kathryn Bruner James (P71374) | Hannah Fielstra (P82101) |
| 1394 E. Jefferson Avenue | 645 Griswold St., Ste. 4100 |
| Detroit, Michigan 48207 | Detroit, MI 48226 |
| Tel: (313) 567-6170 | Tel: (313) 965-5555 |
| kjames@goodmanhurwitz.com | hannah@ecllaw.com |
| *Attorneys For Plaintiff* | *Attorneys for Plaintiff* |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Now comes Plaintiff Ray Fayad, through his attorneys, and respectfully requests that this Court grant partial summary judgment in his favor, pursuant to Federal Rule of Civil Procedure 56. Specifically, Plaintiff seeks summary judgment against all Defendants on Counts II for violation of his right to due process under the United States Constitution. In support of this motion, Plaintiff states the following:

1.      On January   8,   2016, several officers   from Defendants City   of Hamtramck  and  Highland  Park,  including Defendants McMahon,  Dupuis, Stout, and Dabaja, raided Plaintiff's business property where he was building his used auto parts supplier business.

2.      It is  undisputed  that  Defendants McMahon, Dupuis, Stout,  and Dabaja participated  in   removal  of automobiles,  auto  parts, tools,  and computers from Plaintiff's property, including Plaintiff's personal car.

3.      It is also  undisputed  that Plaintiff was  never prosecuted,  much  less convicted, of any crime associated with the items that were removed from his property.

4.      Defendants' testimony reveals that Defendants City of Hamtramck and Highland  Park  had   no   process   for   returning   property under these circumstances.

5.      Finally, it undisputed that the automobiles, auto parts, tools, and computers were never returned to Plaintiff, and at least some of the property remains in the possession, custody, or control of Defendants.

6.      Plaintiff relies on the attached brief to further support his request for relief.

7.      Pursuant to Local Rule 7.1(a), Plaintiff's counsel sought concurrence from Defense counsel via telephone; Defendants did not concur.

WHEREFORE, for the reasons stated above and in the accompanying Brief, Plaintiff respectfully requests that this Court grant partial summary judgment in his favor against all Defendants on Counts II for violation of his right to due process under the United States Constitution.

Respectfully Submitted,
**GOODMAN HURWITZ & JAMES, PC**
/s/ Kathryn Bruner James (P71374)
*Attorneys for Plaintiff*

**ERNST CHARARA & LOVELL, PLC**
/s/ Hannah R. Fielstra (P82101)
*Attorneys for Plaintiff*

Dated: February 16, 2021

**<u>PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

STATEMENT OF THE ISSUE PRESENTED………………………...………iii

MOST APPROPRIATE AUTHORITY………………………………………..iv

TABLE OF AUTHORITIES…………………………………………………....v

    I.INTRODUCTION…………………………………………………………1

    II.STATEMENT OF FACTS…………………………………………………...1

    III.STANDARD OF REVIEW………………………………….……..11

    IV.ARGUMENT……………………………………………………..12

        A. Defendants Violated Plaintiff's Due Process Rights Under Hamtramck's And Highland Park's Established Procedure Of Failing To Return Property Seized Under A Search Warrant Even After It Was Determined That The Property Was Not Contraband And Was Not Needed To Further Investigate Criminal Activity, And Failing To Provide Any Process Subsequent To The Search Warrant Before Permanently Depriving Property Owners Of Their Lawfully Owned Property.. ……………………………………...12

        B. There Is No Requirement To Demonstrate An Inadequate Post-deprivation Remedy Under State Law Since Plaintiff's Procedural Due Process Claim Is Based Conduct Pursuant To An Established Governmental Procedure Where Defendants Were Acting Within The Broad Discretion Granted To Them By The Government, The Deprivation Resulted From Predictable Error And Defendants Actions Were Tacitly Approved By The Government…………..19

        C. The Rights at Issue Were Clearly Established And Defendants Are Not Entitled To Qualified Immunity…………….23

D. Plaintiff Has demonstrated the viability of his *Monell* Claim..27

E.  Defendants, Including the Municipal Defendants All
    Contributed to the Wrongful Deprivation of
    Plaintiff's Property…………………………………………28


V.CONCLUSION……………………………………………………29

## <u>STATEMENT OF THE ISSUE PRESENTED</u>

Whether Summary Judgment Should be Granted in Plaitniff's Favor When His Property Was Unlawfully Retained by Defendants Pursuant to an Established Procedure of the COBRA Task Force and the Defendants After Plaintiff Was Released from Jail and Defendants Determined That His Property Was Not Contraband and Was Not Part of a Criminal Investigation.

Plaintiff's Answer: Yes.

This Court Should Answer: Yes.

## <u>MOST APPROPRIATE AUTHORITY</u>

*Jameson v Oakland Co*, ___F Supp 2d___; 2011 U.S. Dist. LEXIS  83392, at *10-13 (ED Mich, July 29, 2011)

*Propert v District of Columbia*, 948 F2d 1327, 1332 (1991)

*United Pet Supply, Inc. v. City of Chattanooga,* 768 F.3d 464, 485 (CA 6, 2014)

*Hudson v. Palmer*, 468 U.S. 517 (1984)

Fed. R. Civ. P. 56

# TABLE OF AUTHORITIES

**Cases**

*Albrecht v. Treon*, 617 F.3d 890, 894 (6th Cir. 2010) ……………………………26

*Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)………………………….…..…...14

*Arnold v. International Business Machines Corp.*,
   637 F.2d 1350, 1355 (9th Cir.1981)…………………………………………….28

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427,
   2436, 85 L. Ed. 2d 791 (1985)……………………………………………………27

*Corsetti v. Hackle,* 2013 US Dist. Lexis 76908 (E.D. Mich. 2013)………………28

*Grannis v. Ordean*, 234 U.S. 385, 394 (1914)…………………………………….14

*Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)…………………………… 13

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)…………………………………..24

*Henry v City of Middletown*, 655 F App'x 451 (CA 6, 2016)………………………16

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ………………………………………..25

*Hudson v. Palmer*, 468 U.S. 517 (1984)……………………………..…...19, 27

*Jameson v Oakland Co*, ___F Supp 2d___; 2011 U.S. Dist. LEXIS
   83392, at *10-13 (ED Mich, July 29, 2011)………………………………..20

*Mitchell v. Fankhauser*, 375 F.3d 477, 483-84 (6th Cir. 2004)……………………19

*Nichols v. Wayne Cty.*, 822 Fed. Appx. 445, 449-450
   (6th Cir. Mich. August 18, 2020)………………………………………………15

*Paterek v Village of Armada*, 801 F3d 630 (CA 6, 2015)…………………………..24

*Propert v District of Columbia*, 948 F2d 1327, 1332 (1991)……………………..14

*United States v. Lanier,* 520 U.S. 259, 271 (1997)…………………………………25

*United Pet Supply, Inc. v. City of Chattanooga,* 768 F.3d 464, 485 (CA 6, 2014)…16

*White v Pauly*, ___US___; 137 S Ct 548, 552; 196 L Ed 2d 463, 468-69 (2017)…25

## **Court Rules**

Fed. R. Civ. P. 56

# I. INTRODUCTION

For more than five years, Plaintiff Ray Fayad has sought the return of nearly one hundred vehicles, engines and other major auto parts, tools, documents, and computers that Defendants seized from his newly purchased used auto parts yard that he was trying to get stocked, licensed, and open for business.

This case involves numerous injustices and indignities against Mr. Fayad by officers in the now-disbanded "COBRA" auto theft task force, which will be examined in more detail in forthcoming papers. This motion is limited to the seizure and *de facto* forfeiture of Plaintiff's property without due process of law. Taking the facts in a light most favorable to Defendants, it is undisputable that Defendants had no authority to permanently deprive Plaintiff of his property.

# II. STATEMENT OF FACTS

## A.    Plaintiff's background through early 2016

Plaintiff Ray Fayad emigrated from Lebanon to Michigan in the late 1990s. (Ex. 1, Fayad Dep. p. 11). He came here already having experience in automobile repair, so he built his livelihood here working as a mechanic, used car dealer, and used auto parts sales. (Id., pp. 12-18). Plaintiff's business largely consisted of purchasing vehicles from auctions or private sales and either fixing up the vehicles for resale or dismantling it for parts to use for repairs or to sell. In the years preceding the underlying incident, Plaintiff had operated Rock Auto Sales in

the City of Detroit from 2010 to sometime in 2014. (Id., p. 18). In 2014, Plaintiff closed that business because of a dispute with his landlord and moved his inventory to a storage facility. (Id., p. 22). Plaintiff did not have a formal business through 2015. (Id.)

In late 2015, Plaintiff purchased an interest in an auto part yard (i.e., "junkyard") on Martinsville Road in Belleville, which included the junkyard itself as well as its contents[1], including over 100 cars.[2] (Ex. 1, pp. 26-33, 61). He moved his inventory – mostly Dodge Chargers, Chrysler 300s, and Dodge Magnums – and paperwork to the junkyard and worked to obtain the appropriate business licenses before opening. (Id., pp. 23-24, 42, 127).

On January 8, 2016, five or more officers, including Defendants McMahon and Dabaja, arrested Plaintiff while he was parked in his son's driveway in Dearborn; Plaintiff had no idea why he was being arrested. (Ex. 1, Fayad Dep. p. 38, 47-49). Defendants seized the car the Plaintiff had been using, as well as the car of Plaintiff's friend who happened to be visiting at the time. (Id., pp. 50-51). Plaintiff was taken to the Hamtramck Police Department where he was held for three days and released. (Id., p. 53).

Following his release, Plaintiff went to the junkyard and saw that it had been stripped of its inventory in the raid. (Id., p. 135). More than 90 vehicles were taken, along with tools, computers, and paperwork. (Id., pp. 57, 61,

135). Plaintiff called Hamtramck Police and spoke to Defendant Stout the next day to get his property back; Stout told him that the matter was still under investigation and to call back in a few weeks. (Id., pp. 70-71, 102, 135). Plaintiff continued to call with the same result for months. (Id.) Eventually, Stout told Plaintiff to call Defendant McMahon; Plaintiff called the number and never received a return call. (Id.; *but see*, Ex. 2, McMahon Dep. p. 112). Notably, Plaintiff was never prosecuted for any alleged crime associated with his Belleville property. (*See e.g.,* Ex. 2, McMahon, p. 58)

Plaintiff lost many documents – receipts, titles, a police book – that had been in his office or in his car. (Ex. 1, Fayad Dep, pp. 19, 42-44, 62, 98-99, 136). The loss of so many vehicles killed his business before it ever opened. (Id., p. 131). Eventually, Plaintiff hired an attorney to seek the return of his property, and an action was filed in 31st District Court in September 2017. (Ex. 3).[3]

In the meantime, Plaintiff sold the junkyard and leased a smaller property in anticipation of having his property returned. (Ex. 1, Fayad Dep. p. 71). At some point in 2017, Defendant Dabaja visited Plaintiff at his new business, bought an engine, and eventually introduced himself to Plaintiff as one of the officers who arrest him in January 2016. (Id., pp. 50-51, 108-109). Dabaja repeatedly called Plaintiff and showed up– often armed and in uniform – at Plaintiff's business, threatened him to drop his lawsuit, and demanded cash

from Plaintiff. (Id., pp. 80, 84, 110-112). Plaintiff also saw Defendant Dabaja with Plaintiff's personal vehicle that Defendants had seized from him. (Id., p. 83-85.)

Plaintiff was left in a difficult position to prove that Defendants seized his property. Meanwhile, Defendants were in complete control over what they documented in their inventory of Plaintiff's property. It begs the question of whether officers who unlawfully seize property for their personal gain would bother to document their own misdeed. Plaintiff came to learn additional facts in discovery that demonstrate that Defendants acted recklessly and sloppily at best – but the larger context suggests that these Defendants routinely take advantage of their authority to steal from and/or harass Arabic people who deal in used cars and/or parts. (*See e.g.,* Ex. 5, Stout Dep. p. 34).

### B.    Undisputed facts that form the basis of this motion

Through the discovery process in this case, Plaintiff finally learned Defendants' version of events leading to his arrest. Additional disputed facts will be addressed in forthcoming papers; for the purposes of this motion, Plaintiff relies on the undisputed facts relating to the seizure of his property.

There is no dispute that Defendants participated in the removal of items from Plaintiff's business, Plaintiff was never prosecuted nor convicted of crime related to those items, and that the items were never returned to him. The only dispute relevant

4

to the claims at issue in this motion is the measure of damages – the precise quantity and value of Plaintiff's property.

Defendant McMahon's narrative report section describing the raid and arrest does not describe who was present for specific events throughout the day. (Ex. 6, p. 19; *see also*, Ex. 2, McMahon Dep. pp. 94-97). Defendant McMahon testified that he, Defendant Dupuis, Defendant Dabaja, then-Chief of Highland Park Police Kevin Coney, Highland Park Reserve Officer Mo Zaraket and other unidentified uniformed officers were present for the raid, with Defendant Stout and former-defendant Hamtramck Analyst Andrew Robinson arriving later. (Ex. 2, McMahon Dep. pp. 53, 112-113).[4] Other items that did not require towing were taken to the Hamtramck Police Department. (Ex. 6, Case Report; Ex. 7, Robinson Dep. pp. 37, 40, 50; Ex. 2, McMahon Dep. pp. 62, 69). McMahon and others were present for nearly six hours. (Ex. 2, p. 115).

Plaintiff has provided copies of seventy-three car titles plus a handwritten list of items that were taken from his business.[5] Defendant McMahon testified that twenty to thirty vehicles were towed from the junkyard – some intact, some of large pieces or shells. (Ex. 2, McMahon Dep. pp. 63, 101). The Return to Search Warrant lists thirty-five items, including engines, motors, tires and other car parts, company checks, tools, and two computers. (Ex. 10). Thus, there is some dispute about the specificities of what was taken. However, for the purpose of this

motion, Plaintiff relies only on the items that Defendants acknowledge removing from his property, to wit:

- The Case Report lists twenty-eight items (non-vehicles, but including vehicle parts/accessories) that were tagged as evidence. (Ex. 6, pp. 3-9). The "location" box is empty for these items, thus the Report itself does not indicate whether each item was taken from Nelson Auto Parts or Plaintiff's property, except for evidence tag numbers 16 through 18 that reference Nelson. (Id., p. 7). There are several discrepancies in this list when compared to the two Return to Search Warrant documents. (Exs. 9 & 10). For example, one Michigan license plate is listed on the Report, yet Michigan license plates are listed in both Returns.[6] (Exs. 6, 9 & 10).

- The Case Report goes on to list twenty vehicles that were towed from Plaintiff's property that were marked as "Other Vehicles (not Stolen or Recovered)." (Ex. 6, 11-17).[7]

- The Return to Search Warrant, as discussed above, lists thirty-five items taken from Plaintiff's property. (Ex. 9). This list overlaps somewhat with the Case Report, but the descriptions vary such that the documents do not reconcile. For example, an item listed on the Return simply as "transmission" (Item number 6) does not coincide with anything in the Case Report, as the only transmission listed there was recovered at Nelson Auto Parts. (Ex. 6, p. 17). And number 29 of the Return "Black Husky Tool Bag w/ Tools" is similarly not listed in the Case Report. However, many items listed on the Return match items listed in the Case Report, such as Plaintiff's HP and Levono computers. (Ex. 9, Return, Items 34 & 35; Ex. 6, Case

Rpt., pp. 3-4). Defendant McMahon testified that all vehicles that were towed were listed on the Return to Search Warrant. (Ex. 2, 101). However, this is false, as Defendants' own records list vehicles that were not included on the Return. Moreover, Analyst Robinson testified that he catalogued evidence on the Return to Search Warrant later in the evening, and he did not remember being present when vehicles were being towed. (Ex. 7, pp. 44, 50, 60).

- Defendants also produced a spreadsheet that was part of this case file that lists twenty-seven vehicles – the same twenty that were listed in the Case Report as "Other Vehicles (not Stolen or Recovered)" taken from Plaintiff's property and seven others, presumably taken from Nelson. (Ex. 11) The spreadsheet includes the VIN for each vehicle. Plaintiff has produced titles that match at least 6 of those vehicles. (Ex. 12).

Defendants' deposition testimony makes it clear that there were huge gaps in their process for documenting seized property. Defendant McMahon – the officer in charge of this case[8] – testified that he "guessed" that he was responsible for documenting the property and vehicles, but that he tasked someone else with entering the vehicles. (Ex. 2, McMahon Dep. p. 64). Analyst Robinson testified that he helped catalog things later in the evening; he did not remember being present when vehicles were being towed. (Ex. 7, pp. 23; 44).

Similarly, no one in particular was responsible for entering the vehicles into the LEIN system, but McMahon think someone "may have" entered them in. (Id., pp. 76-77). Defendant Dupuis testified that she was not aware whether any vehicles

were entered into LEIN here. (Ex. 13, p. 46). Analyst Robinson did not recall doing it here, but said they should have been. (Ex. 7, p. 35).

It is undisputed that Plaintiff was not charged or prosecuted for any crime associate with his Belleville property, any of the items removed therefrom, or from his personal vehicle. Defendant McMahon testified, "I was told by Investigator Stout that we were instructed not to pursue a case against Mr. Fayad… He said that he was told that it would look retaliatory toward Arab Americans." (Ex. 2, p. 58). Stout denied knowing whether Plaintiff was charged with a crime. (Ex. 5, pp. 62-63).

Defendant Stout testified, "Once a case is closed or cleared, [the property owner] would get [their property] back if had nothing to do with a crime." (Ex. 5, pp. 66-69; *see also* Ex. 2, McMahon Dep. pp. 71-72). Defendants McMahon, Stout, and Dupuis have the authority to put a "hold" on the vehicles, which prohibits them from being removed from impound. (Ex. 7, Robinson Dep., pp. 52, 55). As discussed above, a decision was made here not to proceed with a prosecution. There is no evidence that this property was associated with a crime – no forfeiture proceeding, no court order. (Ex.2, McMahon Dep. pp. 71-72). And yet, it was not returned, some cars remain on hold, and some have been auctioned. (Ex. 7, Robinson Dep., pp. 38, 41, 50, 52, 55; Ex. 2, McMahon Dep. pp. 69, 103).

**C.**   **Defendants Hamtramck and Highland Park had no process for returning property when charges were not pursued.**

Defendants City of Hamtramck and City of Highland Park had little or no safeguards in place to document seized property thoroughly and accurately – the result of which is evident in the inconsistent documents described above and attached hereto. Additionally, Defendant Cities had no clear procedure for returning seized property.

The COBRA Task Force was a loosely organized unit which had no real oversight or regulating authority. Each officer reported to their supervisor in their respective departments, who notably, were not members of the task force themselves. There was no chain of command within the COBRA unit. (Ex. 2 at 15).  There were no set rules for work division and the officers equally shared responsibilities and worked as a "team" on assignments. (*Id.* at 50; Ex. 5 at 15; Ex. 13, Dupuis Dep at 11, 30).

No officer involved in the COBRA task force was ever disciplined for their pattern of targeting Arab-owned business or for their pattern of unlawfully retaining property seized as part of an initial investigation after the suspect had been released and the property was deemed not contraband or involved in any criminal activity, despite numerous allegations in federal lawsuits that they had done so. (Ex. 2 at 44-45; Ex. 5 at 47-49; Ex. 13 at 24).

Defendant McMahon testified that he was never involved in logging property[9]; he believed Defendant Dupuis, Detective Barkman (a COBRA officer from Ecorse who was off duty on the date of this raid), Defendant Stout, and Hamtramck Officer Robinson assisted with logging property. (Ex. 2, McMahon Dep. p. 70). He did not know who did it in this case, because it was not assigned to anyone in particular; they all collectively took it on. (Id., pp. 70-71). Analyst Robinson testified that he helped COBRA officers catalog evidence on occasion. (Ex. 7, p. 21).

Analyst Robinson testified that it was no particular person's responsibility to enter vehicles into LEIN in raids like this. (Ex. 7, p. 35). Defendant Dupuis testified that she was never responsible for entering cars into LEIN; she was not sure who would have done that in any case. (Ex. 13, p. 46).

Storing property was similarly disorganized. Defendant Stout testified that it was the primary officer who decided were to place property; almost all property should be stored at the primary officer's department. (Ex. 5, Stout Dep. pp. 69-70). Whereas, Defendant McMahon testified that he stored property a few times at his department in Highland Park a few times, but that they typically used Hamtramck. (Ex. 2, McMahon Dep. pp. 69-70)

As for returning property that had been seized, Defendant's testimony indicated that there was no process for doing so. Defendant Dupuis testified that she

did not know who was responsible; she did not recall ever doing it herself. (Ex. 13, pp. 44-45). Defendant Stout testified that it could be the property officer or he could do it himself. (Ex. 5, Stout Dep. p. 66). He testified that in this case, it was Defendant McMahon's responsibility. (Id. p. 67). Analyst Robinson testified that the responsibility of returning property was case dependent because every case is unique; he was not sure how it was determined who was in charge of returning property, but it could be the officer in charge. (Ex. 7, pp. 40-41). McMahon –the officer in charge here – described a few different hypothetical situations, but nothing resembling a delineated procedure or identifying who is responsible. (Ex. 2, p. 70, *et seq.*).

### III. STANDARD OF REVIEW

This motion is brought pursuant to Fed. R. Civ. P. 56(c)(2), which allows for judgment to be entered by the Court if the pleadings, discovery, and disclosure materials on file show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  The nonmoving party must demonstrate the existence of a genuine issue for

trial by pointing to "specific facts" that create such an issue. *Matsushita*, 475 U.S. at 586-87. The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986). Partial summary judgment may be entered for a plaintiff as to liability alone, with the issue of damages proceeding to trial. Fed. R. Civ. P. 56(g); 10B Wright, Miller & Kane, *Federal Practice and Procedure* § 2736 (3d ed.).

**A. Defendants Violated Plaintiff's Due Process Rights Under Hamtramck's And Highland Park's Established Procedure Of Failing To Return Property Seized Under A Search Warrant Even After It Was Determined That The Property Was Not Contraband And Was Not Needed To Further Investigate Criminal Activity, And Failing To Provide Any Process Subsequent To The Search Warrant Before Permanently Depriving Property Owners Of Their Lawfully Owned Property**.

This case involves a clear procedural due process violation; Defendants seized Mr. Fayad's property over five years ago and never returned it although it was determined not to be contraband and not needed to further investigate criminal activity. Mr. Fayad was never charged with any crime related to the seizure of his property and all officers testified that his property was not contraband, nor was it any longer part of an investigation. Under these circumstances, Mr. Fayad was entitled to the return of his property or, at the very least entitled to a process to retrieve his property before a final deprivation thereof. However, not only did Mr. Fayad receive no process, but no Defendant or other official involved in the seizure

could identify a procedure that would allow Mr. Fayad to retrieve his property, and each denied any responsibility for retuning it although each admitted there was no justification for detaining it. Ex. 5, pp. 66-69; *see also* Ex. 2, McMahon Dep. pp. 71-72.

To comport with due process, there must be some procedure in place that allows property owners the return of property after it has been lawfully seized but subsequently determined to be legally owned. However, the COBRA Task Force, which consists of Highland Park and Hamtramck police officers, including Defendants herein, has an established practice of seizing property and never returning it even when there is no longer a justification for detaining it. Exacerbating this due process violation, there is no process in place to allow property owners to retrieve their legally owned property before being permanently deprived thereof.

The Fourteenth Amendment prohibits the state from depriving any person of property without due process of law. U.S. Const. Amend. XIV § 1. To establish a procedural-due-process claim cognizable under 42 U.S.C. § 1983, plaintiffs must demonstrate that they had a property interest protected by the Due Process Clause, were deprived of that protected interest within the meaning of the Due Process Clause, and that the state did not afford adequate procedural rights before a final deprivation of their protected interest. *Hahn v. Star Bank*, 190 F.3d

708, 716 (6th Cir. 1999), *cert. denied*, 529 U.S. 1020, 120 S. Ct. 1423, 146 L. Ed. 2d 314 (2000)).

"The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). The hearing must be "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). Finally, before there is a final deprivation of property, the state must provide some notice and some opportunity to be heard to comport with due process:

> Depending upon the tilt of the *Mathews* balance in a particular case, the usual requirement of written notice may be relaxed, […]. Nevertheless, however weighty the governmental interest may be in a given case, **the amount of process required can never be reduced to zero - that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final deprivation of a property interest**. *See Logan*, 455 U.S. at 434 ("The State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement."); *Parratt v. Taylor*, 451 U.S. 527, 540, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981) ("Our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests.") (emphasis added).

*Propert v District of Columbia*, 948 F2d 1327, 1332 (1991).

In this case, Mr. Fayad was afforded no notice and no opportunity to be heard before the final deprivation of his property, even after Defendants determined that the property was not contraband and was not needed for further investigation. Indeed, Mr. Fayad was never informed that his property would not be returned, despite contacting the Hamtramck Police Department on multiple occasions requesting the return of his property. (Ex. 1 pp. 70-71, 102, 135). This is

tantamount to an administrative forfeiture without notice and without a hearing and

is a violation of the right to due process. *See Nichols v. Wayne Cty.*, 822 Fed. Appx.

445, 449-450 (6th Cir. Mich. August 18, 2020):

> Although due process generally requires "predeprivation notice and hearing," in some "extraordinary situations," a "valid governmental interest . . . justifies postponing the hearing until after the event." United States v. James Daniel Good Real Prop., 510 U.S. 43, 53, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993) (quoting Fuentes v. Shevin, 407 U.S. 67, 82, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972)). Those extraordinary situations include government seizure of forfeitable property that "could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given." Id. at 52 (quoting Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 679, 94 S. Ct. 2080, 40 L. Ed. 2d 452 (1974)). So, for example, "[t]he seizure of a home" or other real property requires a pre-deprivation hearing, see id. at 54, 61-62, but the seizure of a vehicle does not, see Ross v. Duggan, 402 F.3d 575, 583-84 (6th Cir. 2004) (ruling that "pre-seizure hearings are not constitutionally mandated" for cars because they are "mobile property" (emphasis omitted)).

> Seizing property that falls into this "mobile property" exception does not let the government off the due-process hook, however. The government must still provide the owner with "notice and a timely post-seizure [hearing]   prior to forfeiture." Ross, 402 F.3d at 584 (emphasis omitted) (citing United States v. Von Neumann, 474 U.S. 242, 249-50, 106 S. Ct. 610, 88 L. Ed. 2d 587 (1986)). Ordinarily, a forfeiture hearing is the post-deprivation process.

In this case, Mr. Fayad was not afforded a forfeiture hearing or any other

type of process.  His property was simply seized and never returned.  The

seizure of his mobile property, even though pursuant to a warrant, likewise

does not let the government off the hook.  The blatant nature of the due process violation is also evident when the *Mathews* due process test is applied.

> [Courts] apply the well-known balancing test from Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), to determine if due process was afforded, and we consider: "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and "the Government's interest, including the function involved, and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335.

*United Pet Supply, Inc. v. City of Chattanooga,* 768 F.3d 464, 485 (CA 6, 2014), *See also Shoemaker v. City of Howell*, 795 F.3d 553 (6th Cir. 2015).  Permanently depriving Mr. Fayad of his property in the manner set forth in the complaint and demonstrated above constitutes a violation of procedural due process as guaranteed by the Fourteenth Amendment.

Regarding the first *Matthews* factor, the private interest affected was extremely substantial. Mr. Fayad's phone, work computers, and vehicles, including vehicles that made up the inventory of his business and vehicles for his personal use, have been in the possession of the Defendants for over five years.  This property is his livelihood.  In *Henry v City of Middletown*, 655 F App'x 451 (CA 6, 2016), the Court opined that:

> Plaintiffs' private interests in owning and utilizing their vehicles are substantial; their livelihoods rest in large part on their vehicles, as they need them to get to work, school, to access health care, and for other necessities, and the vehicles represent a large investment.

*Id.* at 462-63.  As the court also noted in *United Pet Supply*, "[T]he property interest in a person's means of livelihood is one of the most significant that an individual can possess."  768 F.3d at 486.

Regarding the second *Mathews* factor, the risk of an erroneous deprivation was grave and the probable value of an additional procedure to allow property owners to retrieve their lawfully owned property was high. After Mr. Fayad was released from jail and no charges were brought against him nor civil *in rem* forfeiture procedures initiated, he called the City of Hamtramck Police Department repeatedly to inquire about the return of his property.  He was never given his property, nor informed of a process by which he could obtain his property.  As described above, none of the officers involved could identify a process for property owners to retrieve their legally owned property or identify whose responsibility it was to return lawfully owned property.   Obviously, the risk of an erroneous deprivation or property is grave when there is no procedure in place for returning it, and the probable value of implementing a procedure for effecting the return of lawfully owned property is high. However, neither the Highland Park Police Department, Hamtramck Police Department, nor the COBRA Task Force had any system or procedure in place by

which an individual could obtain the return of their lawful property after it was seized.

As to the third *Mathews* factor, the government has no legitimate interest in retaining one of its citizen's property after it has been determined that the property is not contraband or needed for further investigation of criminal activity and thus no justification for continuing to detain it. Defendants' burden in providing a hearing or other mechanism for the return of legal property would be minimal. In fact, in this case, it would not even have required any type of adjudicative hearing as Defendants admitted there was no justification for continuing to detain Mr, Fayad's property. Moreover, it would be advantageous to the government to return property to the lawful owners from whom it was seized as it would obviate the need to store it, along with the attendant storage costs. In sum, there is no significant fiscal or administrative burden to implement a system to return property when the government admits that person making claim to the property is the legal owner.

In this case, not only do the *Mathews* balancing factors weigh heavily in Plaintiff's favor, the process for effecting the return of Plaintiff's property was reduced to zero. Plaintiff was entitled to some type of hearing prior to the final deprivation of his property, especially when Defendants admit there was no justification for permanently depriving him of it, yet he received none. While the search warrant may have provided process sufficient to support the initial seizure, it

did not provide process sufficient to support the final deprivation of property, at least where, as here, the property was not contraband per se. Accordingly, a final deprivation of property by the state without any further process, subsequent to an initial lawful seizure under a search warrant, is redressable as a Fourteenth Amendment violation especially when the deprivation was admittedly no longer justifiable.

**B. There Is No Requirement To Demonstrate An Inadequate Post-deprivation Remedy Under State Law Since Plaintiff's Procedural Due Process Claim Is Based Conduct Pursuant To An Established Governmental Procedure Where Defendants Were Acting Within The Broad Discretion Granted To Them By The Government, The Deprivation Resulted From Predictable Error And Defendants Actions Were Tacitly Approved By The Government.**

Whether Plaintiffs are required to demonstrate the inadequacy of postdeprivation remedies under state law depends upon whether the alleged violation of due process occurred under "established state procedures" or through "a random or unauthorized act." *Mitchell v. Fankhauser*, 375 F.3d 477, 483-84 (6th Cir. 2004). As explained in *Hudson v. Palmer*, 468 U.S. 517 (1984), "postdeprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action." *Id.* at 532 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982)).

The determination of whether a due process violation is caused by conduct pursuant to established state procedures or random or unauthorized acts turns on whether officials were acting within their discretion or outside of it, whether *vel noni* the deprivation was foreseeable and predictable, and whether the government at least tacitly approved of the conduct causing the deprivation or would have prevented it given the chance. As Judge Cleland explained:

> Predictability distinguishes those cases where the act is random and unauthorized from those where the act is executed pursuant to established state procedures. . . . [I]f the deprivation is predictable, and resultingly is or could be the subject of state procedures, then the Hudson-Parratt doctrine does not apply. Thus, the court looks to whether there are state procedures, or whether there could be state procedures, for legally effecting the type of deprivation at issue. See Zinermon, 494 U.S. at 132 ("To determine whether, as petitioners contend, the Parratt rule necessarily precludes § 1983 liability in this case, we must ask whether predeprivation procedural safeguards could address the risk of deprivations of the kind [the respondent] alleges."). In Logan and Zinermon, the Court held that the state could foresee, and thus could provide predeprivation process . . . By contrast, where the state would not have approved of the deprivation had it known about and been able to prevent it, the conduct is random and unauthorized.

*Jameson v Oakland Co*, ___F Supp 2d___; 2011 U.S. Dist. LEXIS 83392, at *10-13 (ED Mich, July 29, 2011). As Judge Cleland explained further,

> Courts also ask whether the depriving act was "misconduct." Mitchell, 375 F.3d at 482 (citing Vicory v. Walton, 721 F.2d 1062, 1064 (6th Cir. 1983)). This is but another lens for examining the predictability of the deprivation. Even though the prison officials in Hudson and Parratt were acting within the scope of their duties when searching a cell or sorting the mail, the actions that led to the deprivation were misconduct: the negligent loss or intentional

destruction of property they caused was not authorized by the state and therefore could not be foreseen by the state. **By contrast, predictable errors involving discretionary calls are not misconduct,** as the state has vested the authority to take action in its agent, and thus can predict that errors will occur.

*Id.* at *13-14 (emphasis added).

Here, Mr. Fayad's property was permanently detained and a final deprivation occurred with **zero** process even after it was determined that the property was not contraband and not needed for further investigation of criminal activity, and even though he was never charged with any crime. This final deprivation was or could have been the subject of state procedures already in place, such as a civil in rem forfeiture action, or the state could have easily implemented procedural safeguards for returning property that was seized but later determined to be legally owned.

Moreover, Defendants clearly had discretion as part of the stolen car task force to return Mr. Fayad's property under the circumstances. The analyst for Hamtramck who worked with the task force testified that whether property should be returned was determined by task force members on a case-by-case basis, which necessarily connotes some exercise of discretion. Defendant Stout admitted that he, along with the officer in charge, could have returned the seized property.

The state vested the authority in the task force members to make these discretionary calls and the resultant errors were easily predictable and foreseeable, especially given that the state provided no process to allow the lawful owners to

retrieve their property, even when there was admittedly no justification for continuing to detain it. This is especially true where, as here, the task force is loosely organized and no one is clearly assigned the responsibility of returning property that has been seized but subsequently cleared of any illegality. When there is discretion vested in officials to return property or not, but no process in place to allow lawful property owners to retrieve their property, and no one is assigned the responsibility of returning legal property, it is not only foreseeable and predictable, but virtually inevitable, that sometimes those officials will erroneously fail to return the property. These inevitable deprivations do not amount to random and unauthorized misconduct on the part of the officials, they instead are easily predictable errors.

To further demonstrate just how predictable the deprivation suffered by Mr. Fayad was, there were multiple lawsuits filed against Highland Park, Hamtramck, COBRA Task Force members and some of the same defendants in the instant case alleging the same types of wrongful and indefinite or permanent deprivations before the wrongful deprivation visited upon Mr. Fayad. (See 2:18-cv-12467; 2:16-cv-11802; 2:16-cv-11891). Thus, it was clearly predictable that these types of discretionary, indefinite and/or permanent deprivations would continue to occur in the absence of any process for the return of property.

Finally, the government approved, at least tacitly, the indefinite or permanent deprivations. Hamtramck was well aware of the deprivation suffered by Mr. Fayad

yet did nothing to remedy it. Mr. Fayad called the Hamtramck Police Department multiple times to try to obtain his property, but he was never informed of a mechanism to provide for its return and literally nothing was done. Hamtramck tacitly approved of the deprivation each time it was put on notice that Mr. Fayad's property was still wrongfully in its possession. Furthermore, the state was well aware of the multiple lawsuits alleging the same types of unlawful deprivations involving other used cars and car parts, but again did nothing. Upon learning of the unlawful deprivations, the state did not implement a procedure to allow lawful owners to retrieve their property. It did not even investigate, much less discipline, the officers involved. And it did not take any type of corrective measures to prevent the wrongful deprivations from recurring.

The unlawful final deprivation at issue here could have been subject to existing state procedures and procedural safeguards to prevent this type of wrongful deprivation could have been easily implemented. The deprivation resulted from a discretionary error that was easily predictable. And the state approved of these types of deprivations when it took literally no action to prevent them from recurring. Accordingly, Mr. Fayad's claims fall outside the *Hudson-Parratt* doctrine and he is not required to demonstrate inadequate post deprivation remedies under state law.

### C. The Rights at Issue Were Clearly Established And Defendants Are Not Entitled To Qualified Immunity.

Qualified immunity shields "government officials performing discretionary

functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Stated another way, the question is whether any reasonable government official could believe his conduct was constitutional.

The more obvious the constitutional violation, the more clearly established the right becomes. As the Sixth Circuit explained in *Paterek v Village of Armada*, 801 F3d 630 (CA 6, 2015):

> [T]he complete absence of case law with a remotely comparable fact pattern [is] a point, which at first glance, seems to weigh in favor of [the defendant's] claim for qualified immunity. . . . However, "a case directly on point" is not required to establish that the law is clearly established, Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011), because "[s]ome violations of constitutional rights are so obvious that a materially similar case" would be unnecessary, Hearring v. Sliwowski, 712 F.3d 275, 280 (6th Cir. 2013). At bottom, the dispositive inquiry is whether, at the time of injury, the law was "sufficiently clear [such] that a reasonable official would understand that what he [was] doing violate[d]" the plaintiff's constitutional rights. Binay v. Bettendorf, 601 F.3d 640, 646-47 (6th Cir. 2010).

> The allegations in this case, if proven, would constitute an obvious violation of Plaintiffs' constitutional rights of which any reasonable official should have been aware.

*Id*. at 650-51.

Defendants had more than fair warning that their actions were unconstitutional. **No reasonable police officer could believe that it could permanently deprive a person of their livelihood when there was no**

24

**justification for the permanent deprivation.**

In addition, for a right to be clearly established, there need not be a prior case with a "similar factual pattern" or "similar factual allegations": "[W]here a general constitutional rule . .  applies with "obvious clarity" to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity." *United States v. Lanier,* 520 U.S. 259, 271 (1997).  As the Supreme Court later explained:

> [O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in Lanier, we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly,  pursuant to Lanier, the salient question . . . is whether the state of the law . . . gave respondents fair warning that their alleged treatment of Hope was unconstitutional.

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  And recently the Supreme Court reiterated "general statements of the law are not inherently incapable of giving fair and clear warning."  *White v Pauly*, ___US___; 137 S Ct 548, 552; 196 L Ed 2d 463, 468-69 (2017).

To establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Albrecht v. Treon*,

25

617 F.3d 890, 894 (6th Cir. 2010) (internal quotation marks omitted). Property rights are "principally created by state law," but "whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law." *Id.* (internal quotation marks omitted).

### 1.  The property rights were clearly established.

Defendants had "fair warning" that Plaintiff had a constitutionally protected property interests in the property of which he was deprived.  The property interest in one's means of livelihood has been clearly established since at least 2014, *United Pet Supply,*  768 F.3d at 486. That a person has a protected property interest in  their automobile at the time of the deprivation is beyond reasonable debate, *see Henry, supra.*

### 2.  The right to notice and an opportunity to be heard were clearly established.

The right to a hearing prior to a deprivation of a significant property interest was established long before these Defendants deprived Mr. Fayad of his property. In 1991, the Supreme Court pronounced:

> An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.  We have described "the root requirement" of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.

*Loudermill, supra*, 470 U.S. at 542. (internal citation and quotation omitted).

Further, it was clearly established that procedural due process rights are violated equally by intentional or negligent deprivations of property. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

Accordingly, Defendants are not entitled to qualified immunity.

**D. Plaintiff Has Demonstrated the Viability of his *Monell* Claim.**

By establishing that Defendants' conduct resulting in the due process violation was pursuant to an established government procedure, Plaintiff has established Monell liability.  *See Porter v Detroit*, 639 F Supp 589, 592 (ED Mich, 1986), finding that the *Hudson* test for demonstrating established procedure was generally sufficient to support a *Monell* claim:

> The first path that a procedural **due process** claim might take is to show that the defendant had an **established procedure** or policy that resulted in the types of constitutional violations alleged by plaintiff. *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). In the seminal case of ***Monell v. New York City Dept. of Social Services***, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978), the Supreme Court held that while local governing bodies are "persons," and therefore  can be sued directly under § 1983, such bodies "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Instead, liability against municipalities should be imposed only when a governmental policy or custom is responsible for the deprivation of constitutional rights. *Id*., 436 U.S. at 690 and 694. The Court has emphasized that the alleged governmental policy must be so tied to the challenged acts that it can be said to be the "moving force of the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981). More recently, the Court has held that "at the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *City of Oklahoma City v. Tuttle*, 471

27

U.S. 808, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985).
*Id.* at 592.

In this case, the municipal defendants' policy of providing no notice

or hearing prior to the permanent deprivation of property seized pursuant to

a warrant was responsible for the due process violation.

**E.    Defendants, Including the Municipal Defendants All Contributed
to the Wrongful Deprivation of Plaintiff's Property**

To state a claim under 42 U.S.C. §1983, a Plaintiff must prove that each

defendant, through their individual actions, has contributed to a violation of the

Constitution. As this Court noted, this standard can be met when the plaintiffs

allege that each defendant was personally involved in the alleged constitutional

violations or when they allege substantive allegations from which that involvement

can be inferred. *Corsetti v. Hackle,* 2013 US Dist. Lexis 76908 (E.D. Mich. 2013).

In *Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355

(9th Cir.1981), the court stated:

> [P]ersonal participation is not the only predicate for section 1983
> liability.  Anyone who "causes" any citizen to be subjected to a
> constitutional deprivation is also liable. The requisite causal connection can
> be established not only by some kind of direct personal participation in the
> deprivation, but also by setting in motion a series of acts by others which the
> actor knows or reasonably should know would cause others to inflict the
> constitutional injury.

Here, Defendant McMahon was the officer in charge. (Ex. 2, McMahon Dep.

p. 64).  Defendant McMahon testified that he, Defendant Dupuis, Defendant Dabaja,

then-Chief of Highland Park Police Kevin Coney, Highland Park Reserve Officer

Mo Zaraket and other unidentified uniformed officers raided Plaintiff's business, with Defendant Stout and former-defendant Hamtramck Analyst Andrew Robinson arriving later. (Ex. 2, McMahon Dep. pp. 53, 112-113). Plaintiff's property that did not require towing were taken to the Hamtramck Police Department. (Ex. 6, Case Report; Ex. 7, Robinson Dep. pp. 37, 40, 50; Ex. 2, McMahon Dep. pp. 62, 69). McMahon and others were present for nearly six hours. (Ex. 2, p. 115). ). After Mr. Fayad was released from jail and was not given any property back, he called Hamtramck Police and spoke to Defendant Stout the next day to get his property back; Stout told him that the matter was still under investigation and to call back in a few weeks. (Id., pp. 70-71, 102, 135). Plaintiff continued to call with the same result for months. (Id.) Eventually, Stout told Plaintiff to call Defendant McMahon; Plaintiff called the number and never received a return call. (Id.; *but see*, Ex. 2, McMahon Dep. p. 112). As evidenced in further detail above, there was no procedure delineated by the Municipal Defendants or the COBRA task force that would allow for the return of Plaintiff's property. Each individual Defendant caused Plaintiff to be subject to the deprivation of his property.

## V.**CONCLUSION**

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that this Court grant partial summary judgment in his favor against all Defendants on Count II for violation of his right to due process under the United

States Constitution and for conversion of his property under state statute and common law.

Respectfully Submitted,
**GOODMAN HURWITZ & JAMES, PC**
/s/ Kathryn Bruner James (P71374)
*Attorneys for Plaintiff*

**ERNST CHARARA & LOVELL, PLC**
/s/ Kevin S. Ernst (P44223)
/s/ Hannah R. Fielstra (P82101)
*Attorneys for Plaintiff*

Dated: February 16, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

Respectfully submitted,

/s/ Hannah R. Fielstra
Hannah R. Fielstra (P82101)
Attorney for Plaintiffs
Ernst Charara & Lovell, PLC
645 Griswold Street, Suite 4100
Detroit, Michigan 48226
Phone: (313) 965-5555
Fax: (313) 965-5556
hannah@ecllawfirm.com

Dated: February 16, 2021